UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
BRIAN ANDERSON,

|  | |
|---|---|
|  Plaintiff, | **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| -v- | Index No. 14-CV-1619 (WFK) (JO) |
| THE CITY OF NEW YORK; New York City Police Department ("NYPD") Lieutenant SEAMUS MCHUGH, in his individual capacity; NYPD Sergeant JAMES KNOEBEL, in his individual capacity, | |
| Defendants. | |

------------------------------------------------------------------------x

Plaintiff BRIAN ANDERSON, through his attorney Robert M. Quackenbush of Rankin & Taylor, PLLC, as and for his first amended complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff BRIAN ANDERSON's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis arrested and used unlawful force against Mr. ANDERSON, in apparent retaliation for him giving the middle finger to a plainclothes officer in an unmarked car during a traffic dispute.

3. By reason of defendants' actions, including their unreasonable and unlawful seizure of his person, Mr. ANDERSON was deprived of his constitutional rights.

4. Mr. ANDERSON also seeks an award of compensatory and punitive damages and attorneys' fees.

1

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Mr. ANDERSON's claim arose in Kings County, within the confines of this judicial district.

7. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8. Plaintiff BRIAN ANDERSON was at all times relevant to this action a resident of the County of Kings in the State of New York. He is currently a resident of the County of County of Multnomah in the State of Oregon.

9. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

10. Defendants NYPD Lieutenant ("Lt.") SEAMUS MCHUGH and NYPD Sergeant ("Sgt.") JAMES KNOEBEL (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

11. The individual defendants are being sued herein in their individual capacities under federal law.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

13. The events described herein occurred primarily in the vicinity of 440 Flushing Avenue in Kings County on the afternoon of May 24, 2013.

14. At approximately 4:45 p.m., Mr. ANDERSON was lawfully riding his bicycle eastbound on Flushing Avenue approaching Bedford Avenue.

15. On this particular stretch, Flushing Avenue lacked a designated bicycle lane and Mr. ANDERSON was lawfully riding approximately three feet from parked cars on Flushing Avenue to avoid any opening car doors.

16. Lt. MCHUGH and Sgt. KNOEBEL were driving together inside an unmarked police car behind Mr. ANDERSON and began aggressively driving approximately one car length behind Mr. ANDERSON.

17. During this time, other vehicles stopped in traffic prevented Mr. ANDERSON from changing into a different lane of Flushing Avenue to allow the unmarked police vehicle to pass.

18. The driver of the unmarked police vehicle then honked his car horn at Mr. ANDERSON.

19. In response, Mr. ANDERSON expressed his displeasure with the driver's impatience by lawfully raising his right middle finger in the driver's direction.[1]

20. In apparent retaliation for Mr. ANDERSON's gesture, the driver accelerated forward and drove in front of Mr. ANDERSON at the intersection of Flushing Avenue and Bedford Avenue, forcing Mr. ANDERSON to stop.

21. Lt. MCHUGH and Sgt. KNOEBEL exited the unmarked police car and charged toward Mr. ANDERSON.

22. Lt. MCHUGH and Sgt. KNOEBEL were dressed in gray suits with no NYPD markings.

23. Either Lt. MCHUGH or Sgt. KNOEBEL screamed, "WHO'S THE FUCKING GUY NOW?" at Mr. ANDERSON twice as both NYPD officials strode toward Mr. ANDERSON, and stopped at the front and side of Mr. ANDERSON.

24. During this time, Mr. ANDERSON remained straddling his bicycle's top tube with his hands down at his sides.

25. One of the individual defendants shouted in Mr. ANDERSON's face, in sum and substance, "YOU SHOULD BE IN THE BIKE LANE."

26. In response, Mr. ANDERSON stated that there was not a bicycle lane on that stretch of Flushing Avenue and that he was within his rights to ride his bicycle in the road there.

27. The same individual defendant shouted at Mr. ANDERSON's acquaintance, another cyclist, standing nearby that they would arrest him if he did not leave.

---

[1] The use of the middle finger as an insult had roots in ancient Greece. See *Swartz v. Insogna*, 704 F.3d 105, 107 n.1 (2d Cir. 2013) (citations omitted) (noting the apparent use of the gesture by Diogenes to insult Demosthenes and by Strepsiades to insult Aristotle).

Since at least 1886, when a joint baseball team photograph of the Boston Beaneaters and the New York Giants showed a Boston pitcher giving the finger to the Giants, "the middle finger has evolved into perhaps the most commonly used insulting gesture in the United States." Robbins, I., *Digitus Impudicus: The Middle Finger and the Law*, 21 U.C. Davis L. Rev. 1403, 1415 (2008).

28. At that time, one of the individual defendants hit Mr. ANDERSON in his cheek and the other individual defendant pushed Mr. ANDERSON, thereby knocking Mr. ANDERSON and his bicycle to the ground.

29. Lt. MCHUGH and Sgt. KNOEBEL pinned Mr. ANDERSON facedown to the ground, and one of the individual defendants told Mr. ANDERSON, "NOW FOR NOTHING, YOU'RE GOING TO SPEND YOUR WEEKEND IN JAIL."

30. Either Lt. MCHUGH or Sgt. KNOEBEL used his handheld radio to request back-up, identifying himself and the other officer for the first time as NYPD officers.

31. Despite the fact that Mr. ANDERSON was not attempting to resist or flee, one of the individual defendants pressed Mr. ANDERSON's face down to the ground at the base of his neck for approximately five minutes, during which time it began to rain.

32. Approximately eight NYPD officers arrived on the scene in approximately four squad cars and witnessed Lt. MCHUGH and Sgt. KNOEBEL with Mr. ANDERSON in custody.

33. Mr. ANDERSON was rear-cuffed and led to an NYPD squad car.

34. Either Lt. MCHUGH or Sgt. KNOEBEL instructed one of the responding officers to write Mr. ANDERSON a summons.

35. One or more of the responding officers transported Mr. ANDERSON to the 90th Precinct at 211 Union Avenue and issued him a criminal court summons for Reckless Operation of Bicycle (N.Y. ADC. Law § 19.176).

36. Outside the precinct, Lt. MCHUGH and Sgt. KNOEBEL arrived as Mr. ANDERSON was about to be released from custody. One of the individual defendants took Mr. ANDERSON's criminal court summons, crumbled it up, and shoved it into Mr. ANDERSON's hand, while

the other individual defendant lectured Mr. ANDERSON about why he should have respect for their authority.

37. Mr. ANDERSON asked the individual defendants why he was brought to the precinct stationhouse if he was just going to be released. In response, one of the individual defendants answered, "BECAUSE I WANTED YOU TO WALK HOME IN THE RAIN."

38. In support of the charge, Lt. MCHUGH swore that "[defendant] was observed driving recklessly on a bicycle in/out of traffic."

39. Lt. MCHUGH's sworn allegations were false; Mr. ANDERSON was not riding his bicycle in and out of traffic.

40. In court on August 20, 2013, Mr. ANDERSON was arraigned on false charges of Reckless Operation of Bicycle (New York City Administrative Code § 19.176), and his case was adjourned in contemplation of dismissal – a disposition ultimately resulting in the dismissal of the charge against him.

41. As a result of the individual defendants' false arrest and false detention against him, Mr. ANDERSON experienced physical, emotional, mental and psychological pain and suffering and was deprived of his liberty.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
(*Against the Individual Defendants*)

42. Mr. ANDERSON incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

43. The individual defendants, under color of state law, subjected Mr. ANDERSON to the foregoing acts and omissions, thereby depriving Mr. ANDERSON of his rights, privileges and immunities secured by the First, Fourth and Fourteenth Amendments to the United States

Constitution, including without limitation, deprivation of the following constitutional rights: (a) freedom from retaliatory arrest and retaliatory prosecution, against Lt. MCHUGH and Sgt. KNOEBEL; (b) freedom from unreasonable seizure of his person, including false arrest and false imprisonment and excessive force (against Lt. MCHUGH and Sgt. KNOEBEL); (c) freedom from the lodging of false charges against him by police officers, against Lt. MCHUGH; and (d) freedom from having police officers fabricate evidence against him, against Lt. MCHUGH.

44. The individual defendants' deprivation of Mr. ANDERSON's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**DEPRIVATION OF RIGHTS**
<u>**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**</u>
(*Against the CITY OF NEW YORK*)

45. Mr. ANDERSON incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

46. All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

47. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts, and/or failed to prevent or stop those acts, and/or allowed or encouraged those acts to continue.

48. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices,

procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

49. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a.  Detaining, arresting and manufacturing evidence against individuals who were engaged in conduct protected by the First Amendment;

    b.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i.  in order to protect other officers; and/or

        ii.  in order to chill or obstruct persons from lawfully engaging in activities protected by the First Amendment;

    c.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

    d.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers; and

    e.  Retaliating against officers who report police misconduct.

50. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

    a.  <u>People v. Alicea</u>, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

    b.  <u>People v. Arbeedy</u>, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's

practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

c.   Bell v. City of New York, 12-CV-5357 (PAC) (S.D.N.Y.) (officer arrests plaintiff after plaintiff gave other officers the "middle finger");

d.   Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

e.   Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

f.   Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

g.   Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[2]

h.   Colon v. City of New York, 09-CV-0008 (JBW) (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has

---

[2]   For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

i.   Callaghan v. City of New York, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[3]

j.   Dunlop v. City of New York, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

k.   Carmody v. City of New York, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

l.   MacNamara v. City of New York, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.), and related cases (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people arrested in the 2004 Republican National Convention);

m.   Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.   Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

o.   Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

---

[3]      For a description of this case and the nearly $1 million settlement, see, Cate Doty, Bike Riders in New York Win Settlement, N.Y. Times, October 18, 2010, available at http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

51. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

    b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

    c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-0008 (JBW) (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, then-Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[5]

    d. Regarding the CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian

---

[4]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[5]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[6] When it does, however, the Commissioner controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during then-Commissioner Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[7] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[8]

e.  In 2012, out 5,760 complaints taken up by the CCRB, the CCRB substantiated only 967 (about 9%). *See*, CCRB Annual Appendix 2012, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_appendix_2012.pdf.  A former employee of the CCRB has reported that there is strong and explicit institutional pressure within the CCRB to keep the number of unsubstantiated cases to a minimum. *See* David Noriega, *The Thin Blue Lie*, New Inquiry, *available at* http://thenewinquiry.com/essays/the-thin-blue-lie/.  From 2002 through 2010, in 92 percent of the substantiated cases referred to the NYPD by the CCRB, the NYPD did not follow the CCRB's recommendation that officers with substantiated claims of misconduct be disciplined with the most serious penalty of charges and specifications.[9] In 2012, the NYPD issued only verbal or written "instructions" to the

---

[6]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[7]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[8]     Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[9]     "Diminished Accountability: How Discipline for Police Misconduct is Downgraded by the NYPD," Citizens Union of the City of New York, March 2012, available at http://www.citizensunion.org/www/cu/site/hosting/Reports/CUReport_AccountabilityPoliceMisconduct.pdf.

subject officer in 62 percent of the substantiated complaints referred to them by the CCRB, and declined to take any action whatsoever in 21 percent of such cases.[10]

52. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[11]
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[12]

    b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case

---

[10]    CCRB Annual Report 2012, *available at*  http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_2012.pdf.

[11]    Mollen Commission Report, p. 36.

[12]    Mollen Commission Report, pp. 40-41.

against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[13]

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[14] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[15]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the

---

[13]     Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[14]     Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[15]     *Id.*

United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[16]

e.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[17]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[18]

---

[16]      John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[17]      Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

f. In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[19] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[20]

g. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[21]

53. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

h. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

i. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

---

[18]     John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[19]     In sum, the CITY has paid out $80,000 to settle four federal lawsuits against Officer Sean Spencer.  John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[20]     *Id*.

[21]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

j.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

54.  The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including without limitation, then-Commissioner Kelly.

55.  The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and then-Commissioner Kelly who all all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

56.  All of the foregoing acts by defendants deprived Mr. ANDERSON of federally protected rights, including but limited to the constitutional rights enumerated in paragraph "43" above.

17

57. The CITY knew or should have known that the acts alleged herein would deprive Mr. ANDERSON of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

58. The CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

59. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then-Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

60. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr.

ANDERSON's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

61. Mr. ANDERSON's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful _de facto_ policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

62. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of Mr. ANDERSON's constitutional rights.

## JURY DEMAND

63. Mr. ANDERSON demands a trial by jury in this action on each and every one of his damage claims.

_**WHEREFORE**_, Mr. ANDERSON demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b. That he be awarded punitive damages against the individual defendants; and

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

///

///

///

Dated:      New York, New York
            June 9, 2014

                              Respectfully submitted,

                              /s/
            By:      _____
                     Robert M. Quackenbush
                     Rankin & Taylor, PLLC
                     *Attorneys for the Plaintiff*
                     11 Park Place, Suite 914
                     New York, New York 10007
                     t: 212-226-4507
                     f: 212-658-9480
                     e: robert@drmtlaw.com